Filed 5/10/21  P. v. Weathers CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C079704 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF143141) |
| v. | |
| DAVEON TARIQ WEATHERS, | |
| Defendant and Appellant. | |

Defendant robbed a cabdriver at gunpoint.  A jury found defendant guilty of first degree robbery (Pen. Code, §§ 211, 212.5, subd. (a)),[1] and found true a personal use of a firearm enhancement (§ 12022.53, subd. (b)).  The trial court sentenced defendant to an aggregate term of 14 years imprisonment.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

On appeal, defendant asserts that: (1) the trial court erred in admitting the testimony of his former girlfriend concerning prior uncharged acts involving his possession of a firearm -- including an incident in which he discharged the firearm in a Motel 6 room -- admitted to prove the gun defendant used during the robbery was real; (2) the trial court erred in admitting evidence concerning an uncharged robbery of a taxicab driver in Sacramento that took place approximately 45 days after the charged robbery and was assertedly committed by defendant; and (3) cumulative error warrants reversal. In supplemental briefing, defendant asserts (4) that, following the enactment of Senate Bill No. 620, the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (b), firearm enhancement.

We agree that the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the firearm enhancement. Otherwise, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Evidence

The victim worked as a cabdriver and, on April 18, 2014, at approximately 5:00 a.m., he was dispatched to an address on Willow Avenue in West Sacramento. When he arrived, he called the phone number of the client because there was no one at the designated location. The victim spoke with the individual, and eventually defendant approached the taxicab, got in, and sat in the right rear seat. Defendant directed the victim to take him to Safeway. The victim did not know the location, so he followed defendant's directions.

Shortly thereafter, they arrived at the intersection of Jefferson Boulevard and Devon Avenue and defendant told the victim to stop the car. The victim told defendant the fare was $10. Defendant gave the victim $3, and the victim assumed defendant was looking for more cash in his pockets. After one or two minutes, defendant said, " 'Give me everything.' " When defendant repeated his command, the victim looked back at

2

defendant and saw that he was pointing a gun at him. The victim described the gun as possibly black and either a revolver or a pistol.[2] The victim then heard defendant cock the gun. The victim at trial demonstrated the way defendant cocked the gun by holding his left hand over his right hand, and moving his left hand back and then forward. Defendant then demanded money again. The victim gave defendant his wallet which contained approximately $300. Defendant repeated, " 'Give me everything,' " so the victim gave defendant his phone and a Bluetooth device. Defendant exited the vehicle.

Defendant told the victim, " 'Now go from here.' " The victim, who was parked part way in a driveway, put his car in reverse and then looked toward defendant to see where he was going. When defendant saw that the victim was looking at him, defendant yelled, " 'Go away from here otherwise I'll shoot you.' "

The victim went straight home to call the police. He gave the police the telephone number of the person he had been dispatched to pick up, (510) 325-4743.

The victim later identified defendant as the perpetrator of the robbery in a photo lineup, and again at trial. He testified there was "no doubt" defendant was the person who robbed him.

Detective Eric Palmer investigated the robbery. He identified the cell phone carrier for the phone number used to call for the victim's cab. He then obtained a search warrant for the call logs, billing information, identifying information, and other items associated with that cell phone. Eventually, Palmer received subscriber information from the carrier. The carrier identified R.M. in West Sacramento as the person financially responsible for the account. Palmer then searched various police databases, attempting to identify individuals associated with R.M. who matched the victim's description of the perpetrator. Ultimately, Palmer identified defendant as someone both associated with

---

[2] We discuss the victim's testimony concerning the description of the gun, *post*.

R.M. and who matched the description. Palmer prepared a photo lineup including defendant's photograph. When Palmer showed the victim the photo lineup, the victim identified defendant with certainty within seconds.

On July 3, 2014, Palmer and others executed a search warrant at an apartment associated with defendant. Law enforcement found a number of documents associated with defendant, and seized a cell phone.

According to Detective Chris Bernacchi of the Sacramento Police Department, in an interview with Palmer, defendant admitted to robbing a taxi in West Sacramento on April 18, 2014.[3] Detective Matt Luiz of the Sacramento Police Department interviewed

---

[3] Palmer testified, but was not asked about this admission. But shortly before concluding the direct examination of Bernacchi, the prosecutor asked him about a second interview Palmer had with defendant:

"**Q**. . . . Now, after you got done with your interview with [defendant], was there a time that you observed [defendant] interviewed by anyone else after you?

"**A**. Just briefly Detective Palmer.

"**Q**. Were you -- the same kind of question I asked you earlier, were you in a place you could see and hear in the second interview with Detective Palmer?

"**A**. I saw it, but I was also updating my sergeant on the phone as to what was going on in our case.

"**Q**. And in that second interview, do you -- from what you can personally see and observe, do you know in the second interview if [defendant] admitted to Detective Palmer that he was the individual who robbed a taxicab in West Sacramento on April 18th of 2014?

"**A**. Yes."

The prosecutor did not mention the admission in his initial closing argument. In his rebuttal closing, discussing defendant's credibility, the prosecutor stated: "Let's talk about his statement that he gave to Detective Palmer. The first interview he had with Detective Palmer based on what Detective Bernacchi saw. He denied it was him. Then

4

defendant on the same day. Defendant told Luiz that he always carried a gun with him for protection, but he did not describe it. Defendant also gave Luiz his mobile phone number; it was the same number used to call the victim to pick up defendant, (510) 325-4743.[4]

## Verdict and Sentencing

The jury found defendant guilty of robbery in the first degree (§§ 211, 212.5, subd. (a)), and found true the firearm enhancement allegation (§ 12022.53, subd. (b)).

The trial court sentenced defendant to an aggregate term of 14 years imprisonment, calculated as follows: the midterm of four years on count 1, plus a 10-year consecutive term for the personal use of a firearm enhancement.

## DISCUSSION

### I. Evidence of Defendant's Possession of a Real Firearm

### A. Testimony of Defendant's Girlfriend Concerning Defendant's Gun

### 1. Additional Background and Defendant's Contentions

Prior to the commencement of trial, defense counsel noted that the prosecutor intended to call defendant's former girlfriend, A.R., to testify about a prior occasion when defendant possessed a firearm. Defense counsel's original focus on A.R.'s proposed testimony related to impeaching her credibility. He stated that, if A.R. testified, he would want to impeach her with questions concerning a dismissed Yolo County case which involved prostitution. Defense counsel stated: "[W]hat I suggest, so we don't

_____

he comes back after lying during that entire interview and comes back and admits that it was him."

[4] As we discuss *post*, defendant contends that the trial court abused its discretion in admitting, over his Evidence Code section 1101 and 352 objections, the testimony of Luiz and another witness "about the Motel 6 shooting." Defendant does not contend Luiz's testimony concerning defendant's statements that he always carried a gun for protection, or Luiz's testimony concerning defendant's cell phone number, was improperly admitted.

even get into that issue so both sides would be treated fairly as far as keeping that evidence out, is to exclude her testimony altogether. . . . [S]he's not a witness to any robbery. . . She would only testify that on a previous occasion she saw [defendant] with a firearm. [¶] And I think on one occasion that firearm was discharged according to her testimony in a motel room. But I think she should be excluded because once her cross-examination begins I don't know where it's going to end -- on cross and then redirect. So that's my position on" A.R.

The prosecutor stated that defendant had admitted to accidentally discharging a firearm at a Motel 6. The prosecutor further stated that law enforcement investigated the motel room and confirmed A.R.'s account of the firearm discharge. As for the impeachment of A.R., the prosecutor stated that she had no prior convictions and told the court: "to the extent that [defense counsel] wants to impeach [A.R.] of these prior acts, the same analysis has to be done which is why the People put a motion in limine in to get in those several acts.[5] We don't even know exactly what [defense counsel] is talking about. I can tell the Court that [A.R.] has no convictions for any types of prostitution. And I believe that was one of the facts that the Court weighed in allowing certain prior acts of the defendant. [¶] So here we don't have a conviction. Certainly, it can still be a moral turpitude, but it's a higher standard to get it in. There's nothing that's been confirmed one way or the other as to her. Now, [defense counsel] -- if the Court allows it in -- wants to open that door then the People will have every intention of running a semitruck through that door if [defense counsel] opens it. Which is why I don't think that

---

5 In the prosecution's motions in limine, the prosecution sought to introduce defendant's arrest "for violation of . . . §§ 286 (c)(2), 266h, and 207 in Yolo County on April 18, 2014" if defendant were to testify. It appears this is what the prosecutor was referring to in stating that he filed a motion in limine "to get in those several acts."

door should be opened. It wouldn't be proper even by moral turpitude analysis to allow this prior conduct in."

Defense counsel proposed being permitted to ask A.R. on cross-examination whether she engaged in multiple acts of prostitution the prior year. The prosecutor countered that the problem with that approach was that A.R. was 16 or 17 years old at the time, and "was a victim of that pimping case and was doing so at the direction of the defendant. And that's what the whole [dismissed] case is about." The prosecutor asserted that it was "self-serving" by the defense to be permitted to elicit such admissions from A.R. without allowing A.R. to testify as to the background that she was acting at the behest of defendant. Defense counsel responded by asserting that it was a "false choice" whether or not to "open the door," and noted that it would be A.R.'s moral turpitude that would be at issue in the analysis, not defendant's. The trial court reserved on the issue.

Subsequently, upon rethinking the nature of A.R.'s proposed testimony, defense counsel requested an Evidence Code section 402 hearing, asserting for the first time that the evidence of the gun discharge in the Motel 6 room would amount to nothing more than character evidence. He further asserted that there had "to be a nexus with actual evidence in this case."

The prosecutor responded that, to prove the enhancement allegation, it was the prosecution's burden to demonstrate defendant used a real gun. The prosecutor noted that the victim would testify he believed a real gun was used and he heard and saw defendant cock the gun. According to the prosecution, the connection with A.R. was that she saw defendant with one gun which he carried with him "at all times of the night." She had seen him clean the gun near in time to the robbery. Additionally, A.R. would testify that a photograph on defendant's mobile phone of a gun on defendant's lap was the gun she always saw him with and the only gun she knew him to carry. Further, A.R.'s testimony would establish that, between the time of the West Sacramento robbery and the later Sacramento robbery, a discharge of the gun occurred in a motel in Yolo

7

County, which law enforcement would confirm. According to the prosecutor, "[i]t all leads back to the same gun which [A.R.] having knowledge of that and seeing it several times close in time to the fact that this was a real gun and only gun that he had." The prosecutor asserted that an Evidence Code section 402 hearing was unnecessary because the defense had A.R.'s statements.

The trial court declined to hold a hearing. The court stated, with regard to the facts of the dismissed case against A.R., that, if the door was opened, the court would allow the prosecution to pursue the matter. The trial court warned defense counsel, "in order to have each side have an opportunity on this -- just understand if you get close to that, there's a danger point."

The prosecution then asserted that the simplest way to deal with the issue would be a ruling that A.R.'s prior alleged conduct did not amount to moral turpitude. That way, the defense could not open the door. The defense disagreed, asserting that prostitution had been deemed a crime of moral turpitude by the courts, and that it was clear that an arrest or conviction was not required for evidence concerning acts of moral turpitude to come into evidence. Noting that defendant had not been charged or convicted on the Sacramento robbery, defense counsel asserted that, if the parties wanted to be consistent, then the Sacramento robbery should not come in either. The trial court again reserved on the issue.

The following day, the defense reiterated the position that A.R. should not be permitted to testify because she would be offering nothing more than bad character evidence. Defense counsel asserted that defendant's right to cross-examine outweighed the prosecution's interest in presenting character evidence and further asserted that "it's a Pandora's box pursuant to Evidence Code 352 and her testimony is not central to his case in chief, her testimony should be excluded altogether."

The trial court concluded that the defense's interest in cross-examining A.R. on these matters was substantially outweighed by the potential prejudice based on the

evidence that would then come in. The court reasoned that if the prostitution evidence were to come in, the prosecution would be allowed to establish the circumstances of that prostitution, in particular defendant's involvement. That would result in a trial within a trial and would be time consuming. Additionally, there would be substantial prejudice to defendant if the prostitution evidence came in. Therefore, the trial court ruled the defense was not to cross-examine A.R. regarding the prostitution activity when she was a minor.

At trial, A.R. testified that she was 18 years old and that defendant was her former boyfriend. A.R. knew defendant to have a black nine-millimeter handgun which he had with him "[m]ost of the time." Defendant would carry the gun in his waistband underneath his shirt. A.R. had watched defendant load the gun, with nine bullets in the removable magazine and one in the chamber. She also observed defendant cleaning the gun. Among other things, she testified that defendant took the top piece off, which was the piece that is used to "[cock] it back." A.R. never saw defendant with any other gun. He carried that gun on his person, particularly when he was out at night. A.R. also identified defendant in photographs, exhibits 7 and 13, and testified that defendant had a gun in the photographs and that she believed it was the same gun she had seen him with because he "only had one gun to my knowledge. I don't believe that he would have any other gun in any other picture."

A.R. testified that, at some point in 2014, she and defendant were hanging out in their room at a Motel 6.[6] Defendant was "messing around" with his gun when A.R.

---

[6] A.R. was confused as to the date of the Motel 6 incident. At one point, she testified that it occurred in April 2014. She then testified, twice, that the incident may have occurred in April or May 2014. She subsequently testified that the incident occurred on her birthday, and therefore it occurred on June 2, 2014. When asked on recross-examination whether she could say that the incident did not occur in April 2014, A.R. testified: "I'm not certain. It was in between months possibly. I mean, I've gone through a lot of traumatic stress and anxiety and etcetera. I'm recalling to the best of my knowledge . . . ." When asked if she knew whether the incident occurred in April or in

9

heard a very loud noise.  A.R. then saw that there was a hole in the bed, and she realized defendant had fired the gun.  They decided to check out of the motel as soon as possible so that they would not get in trouble.  Before leaving, defendant flipped the mattress in an attempt to conceal the bullet hole.

In his closing argument, the prosecutor posed the question to the jurors:  "How do we know it's a real gun?"  He then answered the question by pointing out various circumstances, including A.R.'s testimony that defendant usually carried a gun, and that she witnessed defendant firing the gun in the Motel 6 incident.

Defendant asserts that the trial court prejudicially erred in admitting A.R.'s testimony concerning his possession and use of a firearm.  He argues on appeal this evidence was inadmissible under Evidence Code sections 1101 and 352, and the admission of this evidence violated his due process right to a fair trial.

## 2.  Firearm Enhancement Element – Use of a Real Gun

With regard to the firearm enhancement, the word " 'firearm' has the meaning provided in subdivision (a) of Section 16520."  (§ 12001.)  Section 16520, subdivision (a), in turn, provides, in pertinent part:  " '[F]irearm' means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion."  "Consequently, 'toy guns obviously do not qualify as a "firearm," nor do pellet guns or BB guns because, instead of explosion or other combustion, they use the force of air pressure, gas pressure, or spring action to expel a projectile.' " (*People v. Law* (2011) 195 Cal.App.4th 976, 983, quoting *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435 (*Monjaras*).)  Thus, to prove the firearm

---

June, A.R. testified that it was not in June, but then further testified that she was confused and nervous and asked defense counsel to ask the question again, which he elected not to do.  However, on redirect examination, the prosecutor asked whether she and defendant had been celebrating a birthday at Motel 6, and she responded that it had been her birthday, which was on June 2.  Thus, it appears that the Motel 6 incident occurred at most 45 days after the charged robbery, and it may have occurred within the same month.

enhancement allegation, the prosecution's burden included proving beyond a reasonable doubt that defendant used a "firearm" within the meaning of sections 12001 and 16520, subdivision (a). The trial court instructed the jury with CALCRIM No. 3146, which incorporates the language of section 16520, subdivision (a).**7**

### 3. Relevance and Evidence Code Section 1101, Subdivision (b)

#### a. Applicable Legal Principles

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.)

Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence

---

**7** The trial court instructed the jury with CALCRIM No. 3146 in pertinent part as follows: "If you find the defendant guilty of the crimes charged in Count I, you must then decide whether the People have proved the additional allegation that the defendant personally used a firearm during the commission or attempted commission of that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] *A firearm is any device designed to be used as a weapon from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion.* … A firearm does not need to be in working order if it was designed to shoot and appears capable of shooting. A firearm does not need to be loaded. Someone personally uses a firearm if he or she intentionally does any of the following. One, displays the weapon in a menacing manner; two, hits someone with the weapon; or three, fires the weapon. The People have the burden of proving such allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

11

of mistake or accident . . . ) other than his or her disposition to commit such an act.  [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."  As this court has previously noted, "[c]ourts subject other crimes evidence to ' "extremely careful analysis" ' [citation] and review the admission of such evidence for abuse of discretion."  (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238 (*Hendrix*).)

### b.  Analysis

Defendant asserts that A.R.'s "testimony about [his] possession and use of firearms was not relevant to prove that the firearm used during the robbery was real" because there was no "evidence linking the two weapons."  Defendant maintains that this evidence therefore amounted to impermissible propensity evidence, the suggestion that the two weapons were the same was pure speculation, and the probative value of the evidence was negligible.

Defendant relies on *People v. Barnwell* (2007) 41 Cal.4th 1038 (*Barnwell*).  In *Barnwell*, the trial court admitted evidence in rebuttal tending to show that, a year before the charged murders, the defendant "possessed another handgun similar to the murder weapon."  (*Id*. at p. 1055.)  In reciting the evidence presented, our high court stated that "[t]here was no suggestion that the pistol" which had a stainless steel finish "was the weapon involved in this case, which had a blue steel finish."  (*Id*. at p. 1044.)  Our high court stated that, "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that *other weapons* were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons."  (*Id*. at p. 1056, italics added.)  Our high court continued:  "Because the prosecution did not claim the weapon" that was the subject of the rebuttal evidence "was the murder weapon, its admission was error."  (*Ibid*.)

12

What distinguishes *Barnwell* from the instant case is that, here, the prosecution *did* assert that the firearm about which A.R. testified was the firearm used in the charged crime *and* the circumstantial evidence tended to prove that assertion. In seeking to have A.R.'s testimony admitted, the prosecutor argued that the prosecution bore the burden of proving that the firearm used in the robbery was a real firearm, and that the connection with A.R. "is that she sees the defendant with one gun carrying it on him at all times -- at all times of the night. That she's seen him clean it close in time to the time that this action occurred. Also on the defendant's cellphone that was searched, there was a picture of him with the firearm in his lap that [A.R.] identified as that being the gun she had always seen him with and that being the gun she had only known him to carry." The prosecutor further asserted that "[i]t all leads back to the same gun which [A.R.] having knowledge of that and seeing it several times close in time to the fact that this was a real gun and only gun that he had."

In his reply brief, defendant asserts that, while it is true that the prosecutor in *Barnwell* did not contend that the firearm at issue was the murder weapon, "the question in our case is fundamentally different. It is whether the weapon was a real firearm or a replica or pellet gun." Therefore, defendant asserts that A.R.'s testimony about his possession of a firearm on other occasions "was nothing more than a backdoor method of admitting improper propensity testimony." Defendant also asserts that the prosecution "did not sufficiently link the two objects." But defendant's contention overlooks the fact that the prosecution could prove that the firearm used in the robbery was a real gun by proving that defendant—whose identification as the perpetrator is not disputed—had one gun he habitually carried around the time of the robbery and that gun was, in fact, a real gun, as established by A.R.'s testimony.

In his initial closing argument, the prosecutor asserted that one way the jury would know defendant used a real gun in the robbery was because A.R. testified defendant usually carried a gun, and that she witnessed defendant firing the gun in the Motel 6

13

incident. He also argued that A.R. knew it was a real gun because, among other things, it was the only gun she ever saw in defendant's possession. The prosecutor subsequently argued: "we know that was a real gun because that's the only gun he's ever been seen with is [*sic*] a Motel 6 incident." Later, the prosecutor argued that, at the time of the robbery, defendant was carrying a real gun, "[t]he only gun he had been seen with was at nighttime, the time of day he typically carried guns and he was carrying it for his protection and to instill that fear in" the victim.

In his rebuttal closing argument, the prosecutor again asserted: "[W]e know that the defendant was in possession of a real gun, was in possession of just the one gun that [A.R.] saw him with at all times, that it was capable of being fired because it was fired and that's not an issue." In connection with a discussion of defendant's credibility as to his statement to Bernacchi that the gun he used in the later Sacramento cabdriver robbery was a $CO_2$ gun, the prosecutor asserted A.R.'s testimony "completely undermines the defendant's credibility in telling you that that gun wasn't real when all of the evidence that we have points to him only having one gun and that gun being real." Addressing the differences between A.R.'s description of the gun she saw in defendant's possession and the victim's description of the gun used in the robbery, the prosecutor emphasized that the victim only testified that the gun used in the robbery "*could have* been different," (italics added) but he did not say it *was* different, than the gun in the photograph. The prosecutor further stated: "At no point was [defendant] ever seen with any other gun than the real gun that is seen in this picture."

The People rely on *People v. Carpenter* (1999) 21 Cal.4th 1016 (*Carpenter*), and assert that A.R.'s testimony was relevant to whether the gun defendant used in the robbery was real. In *Carpenter*, our high court stated: "Defendant contends the court made several other erroneous evidentiary rulings. One witness testified that in February 1981, defendant said he carried a gun in his van. The witness never saw the gun. Another witness testified that in February or March 1981, defendant showed her a gun

14

that 'looks like' the murder weapon. The court ruled both items of evidence admissible over objection. We find no error. Although the witnesses did not establish the gun necessarily was the murder weapon, *it might have been.…* [T]his evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that *might have been* the murder weapon after the first and before the last of the killings. The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses." (*Id*. at p. 1052, italics added.)

Turning to the evidence presented here, when defendant said to the victim " 'Give me everything,' " the victim looked back at defendant and saw that defendant was pointing a gun at him. The victim described the gun as possibly black and either a revolver or a pistol. The victim then heard defendant cock the gun. The victim demonstrated the motion by holding his left hand over his right hand, and moving his left hand back and then forward. On cross-examination, the victim testified that he had told police that the gun was "black with maybe silver top." On redirect examination, the prosecutor showed the victim the photograph of a gun, exhibit 7, and asked if it looked similar to the gun used in the robbery. The victim responded, "Maybe a little different." The victim acknowledged that the gun in the photograph was black and silver. However, when asked if it looked like the same type of gun that was used in the robbery, the victim responded: "I think this *could b*e different." (Italics added.) The victim acknowledged that he did not have much familiarity with guns.

As noted, A.R. testified she knew defendant to have a black nine-millimeter handgun which he had with him "[m]ost of the time." Defendant carried the gun in his waistband underneath his shirt. A.R. had watched defendant load the gun, with nine bullets in the magazine and one in the chamber. She also observed defendant cleaning the gun. Importantly, A.R. never saw defendant with any other gun. A.R. also identified defendant in the photograph and testified that defendant had a gun in the photograph

15

which she believed to be the same gun she saw him with because she only knew him to have the one gun.

A.R. further testified that, in 2014, she and defendant were in a room at a Motel 6 when defendant was "messing around" with his gun and A.R. heard a very loud noise. A.R. then saw that there was a hole in the bed, and she realized that defendant had fired the gun.

A.R.'s testimony concerning the firearm defendant habitually possessed around the time of the robbery had *some tendency in reason* (Evid. Code, § 210) to prove that it was the firearm defendant used in the robbery and was a real firearm within the meaning of sections 12001 and 16520, subdivision (a). Like the circumstances in *Carpenter*, here, A.R.'s testimony challenged by defendant showed defendant possessed a gun that *might have been* the firearm used in the robbery of the victim. (See *Carpenter, supra*, 21 Cal.4th at p. 1052.) The victim described the gun as "I think, like, black" and later as "black with maybe silver top"; A.R. testified that the gun was black. The gun in the photograph was black and silver. Both witnesses describe features of a semiautomatic handgun. The victim described defendant cocking the gun by moving a part above the handle back and then forward. A.R. described a nine-millimeter handgun which could store nine bullets in the removable magazine and one bullet in the chamber, and that the top piece was used to cock the gun.

Defendant emphasizes the differences in A.R.'s description of the firearm she saw and the victim's description of the firearm defendant used in robbing him, but the descriptions were not that discrepant. While the evidence may not have established with complete certainty that the gun used in the robbery was the same gun A.R. saw defendant habitually possess, it *might have been*. Thus, this evidence was relevant as having *some*

16

*tendency* in reason to prove that the firearm used in the robbery of the victim was real. (See *Carpenter, supra*, 21 Cal.4th at p. 1052; Evid. Code, §§ 210, 350, 1101, subd. (b).)[8]

While this appeal was pending, defendant filed a notification of new authority — *People v. Clark* (2021) 62 Cal.App.5th 939 (*Clark*). In *Clark*, the prosecution was allowed to offer evidence of Clark's prior prohibited person in possession of a firearm juvenile adjudication under Evidence Code section 1101, subdivision (b). In that prior, pursuant to a vehicle search, police found a Glock model 27 .40-caliber semiautomatic handgun under the driver's seat. Clark was in the front passenger seat at the time. (*Clark*, at p. 955.) Thus, Clark was in constructive possession of the firearm. There was no evidence he ever had the firearm in his hand. (*Id*. at p. 963.) In the charged offenses, Clark and his confederate robbed three men at gunpoint. However, the gun was never found, and, at trial, the defendants asserted the prosecution failed to prove beyond a reasonable doubt that the object used in the robberies was a real gun. (*Id*. at p.944.) We concluded that the circumstances underlying Clark's prior uncharged act were dissimilar to the circumstances in the charged offenses and the evidence had little tendency to prove Clark knew he had a firearm in the charged offenses and that he knew that firearm was

---

[8] Defendant asserts: "it is even questionable whether the 'cocking' action described by [the victim] was consistent with [A.R.'s] testimony about a semiautomatic firearm with a magazine." In support of this proposition, defendant cites *Silveira v. Lockyer* (9th Cir. 2002) 312 F.3d 1052, 1057, footnote 1. That footnote states, in relevant part, "only one bullet is fired when the user of a semi-automatic weapon depresses the trigger, but another is automatically reloaded into the gun's chamber. [Citation]. Thus, by squeezing the trigger repeatedly and rapidly, the user can release many rounds of ammunition in a brief period of time-certainly many more than the user of a standard, manually-loaded weapon." (*Silveira*, at p. 1057, fn. 1.) The implication of defendant's reliance on this footnote would appear to be that one need not cock a semiautomatic weapon in the manner described by the victim. We need not address the accuracy of this inferential representation because, as the People observe, the evidence in this case is that A.R. and the victim both testified that the gun about which they were testifying was cocked by pulling back the top of the handgun.

real.  (*Clark*, at p. 971.)  Here, conversely, as stated *ante*, A.R.'s testimony concerning the firearm defendant regularly had around the time of the robbery had some tendency in reason to prove that it was in fact the firearm defendant used in the charged robbery and that it was indeed a real firearm.

We conclude that the trial court properly determined that A.R.'s testimony was relevant and not inadmissible under Evidence Code section 1101, subdivision (a).

### 4.  Evidence Code Section 352

#### a.  Applicable Legal Principles

"Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern."  (*Hendrix, supra*, 214 Cal.App.4th at p. 238.)  Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights.  Our high court has emphasized the word 'substantial' in [Evidence Code] section 352.  [Citations.]  [¶]  Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value.  [Citations.]  A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168.)

### b. Forfeiture

Before proceeding to the merits, we address forfeiture. The People assert defendant has forfeited his Evidence Code section 352 contention by failing to specifically raise it before the trial court. According to the People, defendant challenged the evidence on the ground that he would not be able to effectively impeach A.R., and on Evidence Code section 1101 grounds, but defendant did not assert Evidence Code section 352 as a separate ground.

Evidence Code section 353 provides, in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as *to make clear the specific ground of the objection* or motion . . . ." (Italics added.) Thus, a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433 (*Partida*).) " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Id*. at p. 434.)

However, " 'Evidence Code section 353 does not exalt form over substance.' " (*Partida, supra*, 37 Cal.4th at p. 434.) "The statute does not require any particular form of objection. Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection *fairly inform* the trial court, as well as the party offering the evidence, *of the specific reason or reasons* the objecting party believes the evidence

19

should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id*. at pp. 434-435, italics added.)

When discussing the admissibility of the subject evidence in the pretrial conference, defense counsel initially objected because his impeachment of A.R. would be problematic. Subsequently, defense counsel requested an Evidence Code section 402 hearing, asserting that the evidence would be impermissible character/propensity evidence. After repeating for the second day in a row that the evidence constituted improper character evidence, defense counsel asserted that defendant's right to cross-examine outweighed the prosecution's interest in presenting character evidence, and then stated: "it's a Pandora's box pursuant to Evidence Code 352 and her testimony is not central to his case in chief, her testimony should be excluded altogether."[9]

We conclude that defendant sufficiently stated his objection pursuant to Evidence Code section 352 so as to make the nature of his objection known and for the trial court to rule on it. In *Carpenter, supra*, 21 Cal.4th at page 1053, the court concluded that the defendant sufficiently preserved his Evidence Code section 352 and 1101 objections. The *Carpenter* court wrote that the defendant "specifically invoked Evidence Code section 352 at trial. Although he did not specifically cite Evidence Code section 1101 in

---

[9] In rejecting defendant's request for an Evidence Code section 402 hearing and his objection to A.R.'s proposed testimony, the trial court did expressly consider Evidence Code section 352. However, it did so in reference to the defense's ability to cross-examine A.R. on the issues related to alleged prostitution when she was a minor, not the admissibility of A.R.'s testimony about defendant's possession of a firearm.

objecting to these statements (he did in making similar objections to other items of evidence), he did object on the ground that the statements merely showed he was a 'criminal' and a 'bad person.' Under the circumstances, the specific nature of the objection was sufficiently clear to preserve the issue." (*Carpenter*, at p. 1053.)

Here, it is true, as asserted by the People, that defendant did not explicitly argue that "the evidence was more prejudicial than probative." However, we conclude that, under the circumstances here, in the midst of the discussion of this evidence and defense counsel's objection to it pursuant to Evidence Code section 1101, counsel's additional statement that "it's a Pandora's box pursuant to Evidence Code 352 and [A.R.'s] testimony is not central to his case in chief, her testimony should be excluded altogether," was sufficient " 'to alert the trial court to . . . the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility' " under Evidence Code section 352. (*Partida, supra*, 37 Cal.4th at p. 435.)

Further, we note that, because other crimes evidence gives rise to the "serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense" (*People v. Thompson* (1988) 45 Cal.3d 86, 109), "to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*), quoting *Thompson*, at p. 109.) As we discuss *post*, under the authority of *Ewoldt*, *Thompson*, and similar cases, an Evidence Code section 352 analysis is an integral part of the analysis for determining the admissibility of other crimes evidence. As part of its admissibility analysis, the trial court necessarily would have considered whether admission of the evidence violated some rule or policy, i.e., whether the evidence was unduly prejudicial. (*People v. Thompson* (1980) 27 Cal.3d 303, 314; *Hendrix, supra*, 214 Cal.App.4th at p. 238.) For this reason too, we conclude that defendant preserved the Evidence Code section 352 issues for the appeal.

21

### c. Analysis

Defendant asserts that A.R.'s testimony should have been excluded under Evidence Code section 352 because it had "scant" probative value, and it caused undue prejudice in that it portrayed defendant "as an aggressive, violent and dangerous person who regularly carries firearms, enjoys cleaning and 'playing' with them and handles them carelessly such that sometimes they accidentally discharge." Defendant further asserts that this evidence was cumulative because "a victim's testimony generally suffices to prove an object is a real firearm." Additionally, defendant asserts that because the firearm possession about which A.R. testified did not result in a conviction, the jury could have been moved to punish him regardless of his guilt of the charged offense. And defendant emphasizes that the trial court did not give a limiting instruction applicable to this evidence.

We disagree with defendant that A.R.'s testimony had "scant" probative value. She testified that defendant had a black nine-millimeter handgun which he had with him "[m]ost of the time." The shooting in the Motel 6 room occurred, at most, within approximately 45 days of the robbery. As we have shown, A.R.'s testimony was relevant to whether defendant used a real gun in the robbery of the victim. The fact that defendant had a real gun which he had with him most of the time, and which was the only gun A.R. knew defendant to possess, had more than just some tendency in reason (Evid. Code, § 210) to prove, by inference, that the gun he used in robbing the victim was the same gun A.R. had observed and was a real gun. Indeed, we regard the inference as compelling; after all, it is undisputed that defendant was the robber and a jury could reasonably conclude there would be no other reason for defendant to use something other than the gun he customarily carried to commit the charged robbery.

On the prejudice side of the Evidence Code section 352 balance, we conclude that A.R.'s testimony was no more inflammatory than the evidence admitted concerning the charged crime. (See *Ewoldt, supra*, 7 Cal.4th at p. 405.) To the contrary, the evidence

22

concerning uncharged acts involved the mere possession, and accidental firing, of a handgun, whereas the charged offense involved the use of a handgun in a robbery, pointed at the victim in close proximity to make the victim capitulate to defendant's demands. That the uncharged act evidence was less inflammatory decreased the potential for undue prejudice because it was unlikely that the jury disbelieved the victim's testimony but nevertheless found defendant guilty on the strength of A.R.'s testimony, or that the jury's passions were inflamed by the evidence of the uncharged acts. (*Ibid*.)

Defendant asserts that the evidence was cumulative because "a victim's testimony generally suffices to prove an object is a real firearm." For this proposition, defendant relies on *Monjaras, supra*, 164 Cal.App.4th at page 1437. In *Monjaras*, another panel of this court stated: "when . . . a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it *may constitute sufficient circumstantial evidence to support a finding that it was a firearm* within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt, as a matter of law, that the gun was a firearm." (*Monjaras*, at p. 1437, italics added.) Thus, the *Monjaras* court said a victim's testimony that a defendant used what appeared to be a gun could be sufficient evidence to establish that the defendant used a real gun. The court did not say, however, that where a victim testifies that someone robbed him with what appeared to be a gun, the prosecution is not permitted to present other evidence to establish the fact that the gun was real.

"As part of the [Evidence Code] section 352 prejudice analysis, courts consider whether the trial court gave a limiting instruction. A limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating the danger the jury could consider

23

the evidence for an improper purpose." (*Hendrix, supra*, 214 Cal.App.4th at p. 247.) The trial court did not give a limiting instruction addressing this evidence.[10]

Notwithstanding the absence of a limiting instruction, we conclude that the probative value of A.R.'s testimony was *not substantially outweighed* by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) Thus, we conclude that the trial court did not abuse its discretion in admitting A.R.'s testimony over defendant's Evidence Code section 352 objection.

## B. Additional Evidence of the Firearm Discharge at Motel 6

### 1. Additional Background and Defendant's Contentions

The jury heard evidence that, during an interview, Detective Luiz asked defendant if, while he was staying at a Motel 6 in West Sacramento, he fired a gun inside his motel room. Defendant initially denied it, but ultimately admitted to doing so. Defendant acknowledged that he fired a gun into the mattress in the motel room. He said he had rented the room for June 1 through June 3, but fired the shot on June 2.

Luiz later went with crime scene investigator Ruth Pagano to the Motel 6 room defendant had occupied. The mattress on one of the beds had a hole in it approximately one inch in diameter. Pagano continued to investigate and found a hole in the box spring. Pagano concluded that the holes could have been created by a projectile. Pagano concluded that a "projectile or bullet was shot through the mattress and the box spring, a single one." In his closing argument, the prosecutor discussed Luiz's and Pagano's testimony concerning the investigation at Motel 6.

---

[10] Any contention that the trial court erred by not giving the limiting instruction as to this evidence is forfeited. Trial courts generally have no sua sponte obligation to instruct on the limited purpose for which uncharged act evidence can be used. (*People v. Lang* (1989) 49 Cal.3d 991, 1020.) It was incumbent upon the defendant to request the instruction.

Defendant asserts that the trial court erred in admitting the testimony of Luiz and Pagano about the shooting at the Motel 6. He asserts the trial court erred in admitting this evidence because it was inadmissible under Evidence Code section 1101, it should have been excluded pursuant to Evidence Code section 352, and it violated defendant's right to due process and a fair trial.

### 2. Evidence Code Section 1101, Subdivision (b)

Similar to his position on A.R.'s testimony, defendant asserts that this evidence "was not relevant to prove the object used during the taxicab robbery was a real firearm due to an absence of evidence linking the two objects." Defendant further asserts that this evidence was inadmissible propensity/character evidence. Again, we disagree.

We conclude that Luiz's and Pagano's testimony about the Motel 6 investigation was relevant to prove that, at some point within, at most, 45 days of the charged robbery, defendant had a real gun—the gun A.R. testified defendant "almost always" carried. Their testimony corroborated A.R.'s testimony that defendant was handling a gun in the Motel 6 room and defendant accidentally fired the weapon into the mattress. Further, Luiz testified that defendant acknowledged during his interview that he fired a gun into the mattress in the motel room. Similar to the circumstances in *Carpenter*, here, A.R.'s testimony as corroborated by Luiz and Pagano showed that, within 45 days of the robbery, defendant possessed a gun that *might have been* the firearm used in the robbery and that the gun was real. (See *Carpenter, supra*, 21 Cal.4th at p. 1052.) Thus, this evidence was relevant and admissible as having some tendency in reason to prove that the firearm used in the robbery of the victim was real. (See *ibid*.; Evid. Code, §§ 210, 350, 1101, subd. (b).) Further, for the same reasons discussed *ante* in connection with A.R.'s testimony, *Clark, supra*, 62 Cal.App.5th at pp. 951-954 is distinguishable. Here, the evidence surrounding the Motel 6 investigation was relevant to prove the defendant regularly had a gun, the gun defendant had was real, and the gun was possibly the firearm

25

used in the robbery.  Unlike the relevant and highly probative evidence here, the probative value of the evidence in *Clark* was insubstantial.  (*Id*. at p. 953.)

### 3.  Evidence Code Section 352

Having concluded that A.R.'s testimony concerning the Motel 6 shooting was not unduly prejudicial, by even greater force of reason, we conclude that the testimony of Luiz and Pagano on their investigation was not unduly prejudicial.  Like A.R.'s testimony, that of Luiz and Pagano was not more inflammatory than the evidence admitted concerning the charged crime.  (*Ewoldt, supra*, 7 Cal.4th at p. 405.)  Nor did this evidence necessitate undue consumption of time or create a substantial danger of confusing the issues or misleading the jury.

### C.  Harmless Error

We further conclude that, even if the trial court abused its discretion in admitting A.R.'s testimony and/or the Motel 6 investigation testimony, any such error was harmless.

Defendant asserts that the admission of A.R.'s testimony violated his due process rights because "there were no permissible inferences to draw from the evidence" other than that defendant was someone who had a propensity to carry and shoot firearms.  He asserts that he was prejudiced by the admission of this evidence under either *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  He asserts there was evidence he may have used a pellet or $CO_2$ cartridge gun during the charged robbery.  As we discuss, *post*, this evidence came from a statement he made to Bernacchi about the uncharged Sacramento cabdriver robbery.  He also emphasizes that the victim's testimony about the firearm was equivocal and uncertain, and that no firearm or ammunition was ultimately found.

"Federal constitutional errors subject to harmless error review are reviewed under *Chapman*, which requires us to reverse the conviction unless the People can demonstrate that the error was harmless beyond a reasonable doubt."  (*People v. Reese* (2017) 2

26

Cal.5th 660, 671, citing *People v. Aranda* (2012) 55 Cal.4th 342, 267.)  However, "[a] trial court's determinations under Evidence Code section 352 do not ordinarily implicate the federal Constitution, and are reviewed under the 'reasonable probability' standard of . . . " *Watson*.  (*People v. Gonzalez* (2011) 51 Cal.4th 894, 924.)  Additionally, the erroneous admission of prior misconduct evidence is generally tested for prejudice under the *Watson* standard.  (*People v. Welch* (1999) 20 Cal.4th 701, 749-750 [whether or not the introduction of evidence violated Evidence Code § 1101, it was not prejudicial because it was not reasonably probable that a result more favorable to the defendant would have resulted absent admission of this evidence, citing *Watson*]; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018-1019 [the erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded]; see also *People v. Jandres* (2014) 226 Cal.App.4th 340, 357 [*Watson* standard applicable to assessing prejudicial effect of erroneous admission of prior acts evidence under Evidence Code § 1108 following Evidence Code § 352 balancing]; *People v. Mullens* (2004) 119 Cal.App.4th 648, 659 [error in the admission or exclusion of prior acts evidence under Evidence Code § 1108, following an exercise of discretion under Evidence Code § 352, is tested for prejudice under the *Watson* harmless error test].)  Further, having concluded that the evidence was properly admitted for purposes other than those prohibited by Evidence Code section 1101, subdivision (a), it is not the case that "there were no permissible inferences to draw from the evidence" other than that defendant was someone who had a propensity to carry and shoot firearms, and thus any error in the admission of this evidence did not violate defendant's due process rights or render his trial fundamentally unfair.

Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant.  (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.)  "[T]he *Watson* test for harmless error 'focuses not on what a

27

reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Defendant's arguments concerning prejudice expressly pertain only to the firearm enhancement allegation, not the robbery conviction. We conclude that it is not reasonably probable that, had the trial court excluded A.R.'s testimony, defendant would have achieved a more favorable result. The victim testified that, when defendant told him to " '[g]ive [him] everything,' " the victim turned around and saw that defendant was pointing a gun at him. The victim described the gun as possibly black and testified that defendant cocked it. The victim did not testify that the gun was a pellet gun or $CO_2$ gun or anything other than a real gun. He capitulated to defendant's demands. The victim's testimony was sufficient to establish that the gun used in the robbery was real. (See *Monjaras*, *supra*, 164 Cal.App.4th at p. 1437.) Additionally, as noted, defendant told Detective Luiz in an interview that he always carried a gun with him.

The only evidence supporting the conclusion that defendant used a pellet gun or $CO_2$ gun was his own statement in his interview with Bernacchi concerning the uncharged Sacramento robbery, evidence defendant asserts should not have been admitted. As set forth more fully in part II. of the Discussion, *post*, in that interview, defendant told Bernacchi that he did not use a real gun in the Sacramento robbery, and stated that he used a "$CO_2$ cartridges pellet gun." However, during that interview, defendant also denied committing the West Sacramento robbery, claiming that he was in Portland, Oregon, at the time. And in the Sacramento cabdriver robbery, the driver said the robber actually fired his gun. Thus, the jury reasonably could have concluded defendant was untruthful about the nature of the gun he used in the Sacramento robbery.

28

On this record, we conclude that it is not reasonably probable defendant would have achieved a more favorable result as to the firearm enhancement allegation had A.R.'s testimony and/or the Motel 6 investigation testimony been excluded at trial. (See *Watson*, *supra*, 46 Cal.2d at pp. 835-836.)[11]

## II. Evidence of Uncharged Sacramento Cabdriver Robbery

### A. Additional Background

#### 1. The Pretrial Motion

Prior to trial, the prosecutor filed a motion to admit evidence of the uncharged Sacramento cab driver robbery pursuant to Evidence Code section 1101, subdivision (b). The prosecutor asserted that this evidence was relevant to prove modus operandi, identity, motive, and intent.

With regard to modus operandi and identity, the prosecutor asserted that: in both cases, defendant called a taxi *using the same mobile phone*; both robberies were committed during hours of darkness and at times when the pickup locations would be deserted; in each instance, defendant was alone at the pickup location and was wearing black clothing; in each instance, defendant climbed into the back seat like a regular fare and gave the driver a destination; in each case, defendant brandished a handgun and demanded money from the driver; and in each case, in addition to taking money from the driver, defendant also took the driver's mobile phone. Therefore, according to the prosecutor, the evidence of the Sacramento robbery was admissible to demonstrate defendant's modus operandi and to prove defendant's identity as the perpetrator.

With regard to motive, the prosecutor asserted that defendant committed both robberies with the same motive, to obtain cash to give to the mothers of his children. The

---

[11] The other crimes evidence related to the Sacramento cabdriver robbery would further support our determination that defendant sustained no prejudice as a result of the alleged error concerning A.R.'s testimony.

prosecutor asserted: "Showing that Defendant committed a second robbery two months after the Yolo robbery supports the People's theory that Defendant's motive in the Yolo robbery was to obtain money to pay child support, which in turn helps establish Defendant's identity as the perpetrator."[12]

As for defendant's intent in the present case, the prosecutor asserted that the evidence of the Sacramento robbery was relevant to prove defendant intended to instill fear in the victim. The prosecutor also asserted that the "similarities between the crimes support a reasonable inference that Defendant acted with a similar intent in both situations, and that intent was to cause fear so he could obtain property from the victims."

The prosecutor further asserted that the evidence of the Sacramento robbery was not subject to exclusion on Evidence Code 352 grounds, because the prejudicial effect of the evidence did not substantially outweigh its probative value. He argued the evidence concerning the Sacramento robbery was not more inflammatory than the evidence concerning the Yolo robbery. Further, presenting the evidence would take approximately 90 minutes, and therefore would not result in undue consumption of time. Nor would it result in a confusion of the issues. According to the prosecutor, the evidence was critical to prove that this is not a case of mistaken identity, and it was necessary to establish motive and intent "for a cohesive prosecution theory and to establish all elements of the crime." The prosecutor asserted that the evidence would not be admitted to demonstrate criminal predisposition, but instead was necessary to meet the prosecution's burden of proof. And the prosecutor noted a limiting instruction could be given to safeguard against any risk of unfair prejudice to defendant.

---

[12] After confessing to the Sacramento cab driver robbery to Bernacchi, defendant wrote an apology letter explaining that his desire to provide for his family was the reason why he committed that crime.

Arguing the motion before the trial court, defense counsel asserted that evidence of the Sacramento cabdriver robbery would be severely prejudicial and deprive defendant of a fair trial. Counsel emphasized that, in the Sacramento robbery, the victim failed to identify defendant. Therefore, according to defense counsel, the prosecution would be using a weak case to bolster a stronger case.

Asked by the trial court about the similarities and dissimilarities between the two cases, the prosecutor argued that the only dissimilarity was the fact that, following the Sacramento robbery, the victim in the Sacramento case was unable to identify defendant. As for similarities, the prosecutor relied on the facts raised in the written motion. When further questioned by the court concerning the absence of an identification in the Sacramento robbery, the prosecutor emphasized that the mobile phone used to summon the taxicabs in each case led to defendant. Moreover, GPS tracking demonstrated that the mobile phone was in the vicinities of both robberies.

Defense counsel asserted that the cases were only similar inasmuch as taxicab robberies are similar in general. He asserted that most taxicab robberies occur at night when the perpetrator gets in the back seat and points a gun at the driver. He argued that there was nothing distinctive about the alleged gun used, asserting that it would either be a semiautomatic or a revolver. Defense counsel asserted that "it wasn't the same gun. There's nothing to support that theory."

The trial court found the similarities between the two robberies to be "pretty strong," "particularly if you throw in the same phone number. Same MO, same calling the taxi getting the ride -- calling from the same number, of course -- utilizing a weapon, demand for cellphone." The trial court found the perpetrator's demand for each driver's cell phone to be a "unique twist."

As argument continued, the prosecutor asserted that, in defendant's statements to law enforcement, he had confessed to both robberies, and defendant wrote an apology

31

letter for the victim of the Sacramento robbery. Defense counsel asserted that he did not "think that changes the 352 analysis."

The trial court stated: "the Court believes that information has relevance, is probative on the issue of his modus operandi, his intent methodology in committing the robbery. And certainly with the parallel, the circumstances of both crimes are such that this Court is satisfied that under 1101(b) that that information can come in. [¶] Taking a look at the possible 352 problem of substantial prejudice, undue-consumption-of-time issues, the Court believes its probative value is not substantially outweighed by its prejudicial impact, and I will allow it. [¶] I don't think the time consumption -- though it will take a little more time, but if it -- particularly in light of the fact that part of this case will pertain to statements made regarding the Sacramento case, and that will be coming in. So that information will come in."

## 2. Trial Testimony, Jury Instructions, and Closing Arguments

At trial, A.S., the victim of the Sacramento robbery, testified that, in June 2014, he was working as a taxicab driver. On June 18, 2014, at approximately 10:00 p.m., A.S. was given a location for a fare and a contact number of (510) 325-4743. As A.S. approached the designated location, he called the number. A man entered A.S.'s car and sat in the seat behind the front passenger seat. The man asked to go to 10th and K. A.S. indicated that he would make a U-turn so as to avoid driving an extra block, and the individual said, loudly, " 'Don't move.' " He again said, " 'Don't move," followed by "I'll kill you. Don't move. I'll kill you.' " A.S. felt something on his shoulder. A.S. looked back and saw a gun. The individual told A.S., " '[G]ive me money. Give me everything. Give me everything.' " A.S. gave the individual money and a cell phone, and the individual got out of the car. After the individual exited A.S.'s car and began to walk away, A.S. called police with a second cell phone. A.S. followed the individual for less than half a block, at which point the individual, showing the gun and pointing it at A.S., said, " 'Move your car. I'll kill you.' " A.S. turned right, and the individual fired

32

two shots.  As A.S. looked in his rearview mirror, he saw the man get into a car with someone else in the driver's seat.

Sacramento Police Detective Chris Bernacchi was assigned to investigate the June 18, 2014, Sacramento robbery.  At some point, Detective Palmer contacted Bernacchi about Palmer's April 18, 2014, West Sacramento case, and Bernacchi and Palmer agreed that they were both focused on defendant as the perpetrator.  Palmer contacted Bernacchi again to inform him that they were going to execute a search warrant at defendant's home address, and Bernacchi accompanied Palmer to execute the warrant.  Following execution of the search warrant, defendant was taken to the West Sacramento Police Department station, and there Bernacchi interviewed defendant after Palmer interviewed him.  Bernacchi's interview with defendant was recorded, and the recording was played for the jury.

Among other things, in the recorded interview with Bernacchi, the following exchange occurred:

"Q:  . . . Was it even a real gun?

"A:  No, it's a play gun from Wal-Mart.

"Q:  You just took the orange tip off?

"A:  They don't even come with orange tips.

"Q:  Okay, one of the airsoft ones?

"A:  They got CO2 cartridges."

Later in the conversation, Bernacchi again asked defendant if the gun he used was real, and defendant responded that it was not.  He again claimed it was a "CO2 cartridges pellet gun."

The trial court gave the jury a limiting instruction using CALCRIM No. 375.[13] Defense counsel registered no objection to that instruction and did not request any modification of the instruction as given.

In his closing argument, the prosecutor discussed the Sacramento robbery, stating that defendant was not charged with that robbery. He then explained that the jury could consider the Sacramento robbery for several reasons. The prosecutor asserted the jury could consider the Sacramento robbery as relevant to prove identity, motive, "similar intent," and common scheme or plan "to infer and indicate that this in fact was the same person because it's as if it was his criminal signature and how he commits these crimes in similar matters." The prosecutor emphasized the similarities between the two robberies, including: use of the same phone number, which was traced back to defendant; the GPS

---

[13] The trial court instructed the jury with CALCRIM No. 375 as follows: "The People presented evidence that the defendant committed another offense of robbery that was not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. *If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider the evidence for the limited purpose of deciding whether or not the defendant was the person who committed the offense alleged in this case. When the defendant used force or fear to take property in regards to Count I, he intended to deprive the owner of it permanently or remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. The defendant had a motive to commit the offenses alleged in the case. The defendant's alleged actions were not the result of mistake or accident, or the defendant had a plan or scheme to commit the offenses alleged in this case.* [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of count I. The People must still prove the charge beyond a reasonable doubt."

34

tracking indicating the phone corresponding to that number was in the area of each of the robberies; the victims were both taxicab drivers; both robberies occurred at night when it was dark; defendant used a gun in both robberies; defendant sat in the same location in each taxi; and defendant stole the same items from each victim, cash and cellular phones. The prosecutor asserted that these similarities amounted to a "criminal signature."

## B. Defendant's Contentions

Defendant asserts that the trial court abused its discretion in admitting evidence related to the uncharged Sacramento cabdriver robbery. He asserts the evidence was propensity/character evidence inadmissible under Evidence Code section 1101, subdivision (a), that it was inadmissible as substantially more prejudicial than probative under Evidence Code section 352, and that it violated his right to due process and a fundamentally fair trial.

## C. Analysis

### 1. Evidence Code Section 1101, subdivision (b)

" '[T]he admissibility of uncharged crimes depends upon three factors: (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact [i.e., probative value]; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence [i.e., prejudicial effect or other section 352 concern].' " (*Hendrix, supra*, 214 Cal.App.4th at p. 238.) As stated *ante*, "[c]ourts subject other crimes evidence to ' "extremely careful analysis" ' [citation] and review the admission of such evidence for abuse of discretion." (*Ibid.*)

### 2. Materiality and Probative Value

With regard to the permissible bases for admission of other crimes evidence contemplated in Evidence Code section 1101, subdivision (b), our high court has stated: "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the

35

defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ewoldt, supra*, 7 Cal.4th at p. 402.)  Our high court continued:  "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . .  [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts.  Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*Id*. at pp. 402-403.)  Finally, our high court stated:  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.  For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  [Citation.]  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*Id*. at p. 403.)

In the commission of both robberies, the perpetrator called for a taxi from the same mobile phone number, a number linked to defendant.  In each case, the taxi driver arrived at the designated location to pick up his fare.  The perpetrator sat down in the right rear seat.  In commencing the robberies, the perpetrator in each instance repeated, " 'Give me everything.' "  In each case, the taxi driver turned around to see the perpetrator pointing a handgun at him.  In each case, the perpetrator took the taxi driver's money and cell phone, and, additionally, defendant took a Bluetooth device from the victim in the instant case.  The perpetrator then exited the vehicle.  In each instance, when the victim did not immediately flee the area, when it appeared the victim was

36

looking at him, the perpetrator ordered the driver to leave and threatened to shoot or kill him.

Based on the totality of the similarities, particularly the use of the same phone number, we conclude that the trial court did not abuse its discretion in determining that evidence of the uncharged Sacramento robbery was relevant to prove defendant's identity as the perpetrator of the charged West Sacramento robbery. As the evidence summarized *ante* demonstrates, the uncharged Sacramento robbery and the charged West Sacramento robbery "share[d] common features that are sufficiently distinctive so as to support the inference that the same person committed both acts," and the pattern and characteristics of each robbery were sufficiently " 'unusual and distinctive as to be like a signature.' " (*Ewoldt, supra*, 7 Cal.4th at p. 403.)

We do not assign as much significance to the asserted "myriad differences" between the charged and the uncharged robberies raised by defendant as he does. We find several of these differences to be inconsequential to the analysis, including the fact that the two robberies occurred in different cities; that one occurred in the "early morning hours" and another occurred "late at night"; that, in one of the robberies, the perpetrator rode in the taxi for a period of time before commencing the robbery; and that there was only testimony describing the sound of the cocking of the handgun as to one of the robberies. Other differences may be more significant, such as the facts that, following one of the robberies, the perpetrator discharged the handgun and that the perpetrator was observed getting into a vehicle occupied by another person. However, we conclude that these differences were not sufficient to undermine our conclusion that the two robberies were sufficiently similar as to be relevant and admissible on the issue of identity. Indeed, as we discuss *post*, one of the differences—the fact that the robber fired the gun in the Sacramento robbery—had additional probative value.

Moreover, because we conclude that the uncharged robbery was relevant and admissible as to identity, as the People assert, by even greater force of reason, the

37

evidence was admissible as to other matters requiring lesser degrees of similarity, such as intent.[14]  (*Ewoldt, supra*, 7 Cal.4th at pp. 402-403; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 22-26 [evidence of uncharged robberies admissible under Evidence Code section 1101, subdivision (b), to prove intent to rob in felony murder special circumstance case].)

Contrary to defendant's contentions, identity and intent were both material and at issue at trial.[15]  By pleading not guilty, defendant put all elements of the charged crime, and the enhancement allegation, in dispute.  (*People v. Scott* (2011) 52 Cal.4th 452, 470; *People v. Loy* (2011) 52 Cal.4th 46, 72 ["The prosecution does, indeed, have to prove all necessary elements of the crime beyond a reasonable doubt"].)

We conclude that the uncharged Sacramento robbery was material to prove defendant's identity as the perpetrator of the West Sacramento robbery, as well as

---

[14]  Defendant is correct that the trial court did not expressly rule that the uncharged acts evidence was admissible to prove identity.  Defendant asserts that the discrepancy between the court's ruling and CALCRIM No. 375, which provided that the evidence was relevant to additional considerations, "only magnifies the error of the trial court's ruling and bolsters our contention that the uncharged robbery evidence should not have been admitted."  We may affirm the trial court's determination in admitting the evidence, even if the trial court's explanation is wrong on the law.  (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason; if right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion].)  By even greater force of reason, then, we may affirm the trial court's correct determination on both its stated basis and an *additional* basis not verbalized by that court.  Moreover, the court instructed using CALCRIM No. 375, which told the jury that it could consider the uncharged acts evidence for purposes of, among other things, identity.

[15]  While defendant asserts the evidence was cumulative and therefore, not probative on the issue of intent, he does not assert that, in light of his confession to the charged robbery, evidence of the uncharged robbery was cumulative on the issue of identity.  Accordingly, we do not address that issue.

intent.[16]  We also conclude that this evidence was highly probative of those issues;

defendant's commission of the Sacramento robbery, using his cell phone number, was

highly probative as to whether he committed the very similar West Sacramento robbery.

We also conclude the evidence related to the Sacramento robbery was highly

probative to prove the firearm enhancement allegation in the charged robbery, i.e., that

the gun he used in the charged robbery was a real firearm.  As noted, the perpetrator of

the Sacramento robbery fired his firearm twice when A.S. followed him.  This robbery

occurred approximately two months after the West Sacramento robbery, and because

defendant was known to habitually carry a firearm, this evidence was probative as to

whether defendant used that same firearm in the charged robbery and that that firearm

was real.  (See *Carpenter, supra*, 21 Cal.4th at p. 1052.)

### 3.  Evidence Code Section 352

We further conclude that the trial court correctly determined that the probative

value of this evidence was not substantially outweighed by the probability that its

admission would necessitate undue consumption of time or create a substantial danger of

undue prejudice, of confusing the issues, or of misleading the jury.  (Evid. Code, § 352.)

The admission of this evidence did not result in undue consumption of time in the context

of this trial.  Nor did the admission of this evidence create a substantial danger of

confusing the issues or misleading the jury.  Defendant admitted to Bernacchi his

perpetration of the Sacramento cabdriver robbery, and thus the jury would not have been

diverted into a determination as to whether defendant was the perpetrator of that crime.

Defendant asserts that the evidence concerning the Sacramento robbery was more

inflammatory because the perpetrator discharged his firearm twice.  We are not

---

[16] Defendant does not specifically assert error in instructing the jury that the evidence could be considered as to motive, lack of mistake or accident, or common scheme or plan.  Accordingly, we do not address those theories.

persuaded that this resulted in undue prejudice, however.  Nobody was struck by the gunfire, there was no evidence the victim's car was struck and there is no evidence as to how close the bullets came to the victim.  Thus, we conclude this fact was unlikely to inflame the passions of the jury such that the probative value of this evidence was substantially outweighed by the probability of a substantial danger of undue prejudice.  Indeed, as noted, there was additional probative value related to proving the firearm enhancement in the charged offense, and that probative value outweighed any prejudice resulting from evidence the gun was fired.

As we have noted, "[a] limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose."  (*Hendrix, supra*, 214 Cal.App.4th at p. 247.)  As set forth *ante*, the trial court instructed the jury with CALCRIM No. 375 on the limited purposes for which the jury could consider the uncharged robbery evidence.  (See fn. 13, *ante*.)

Defendant quibbles with the instruction, asserting that the language stating, " 'In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense,' " was flawed.  Defendant relies on *Hendrix, supra*, 214 Cal.App.4th at page 247, in which we concluded, based on essentially the same language, that, "in the context of [that] case, the instruction was confusing."  The "context" of *Hendrix* included the fact that we found the prior uncharged acts to be materially dissimilar to the charged offense, lacking in probative value, unduly prejudicial, and cumulative.  (*Id*. at pp. 239, 247.)  The context of this case is quite different.  Here, the prosecutor argued in closing that the highly similar uncharged robbery was relevant to prove among other things identity and intent.  We conclude that, *in the context of this case*, CALCRIM No. 375 was not confusing and did not compound any preexisting problem.  The similarity between the charged and uncharged offenses was relevant in the ways asserted by the prosecutor in closing arguments, and the

instruction directed the jurors to consider the similarities or lack thereof in making their determinations.

## III.  Cumulative Error

According to defendant, even if we find individual errors to be harmless, the cumulative effect of these alleged errors deprived him of due process and a fundamentally fair trial.  The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect may require reversal.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.)  We have concluded that defendant's claims of error are without merit.  We further conclude defendant was not deprived of a fair trial.

## IV.  Senate Bill No. 620

In addition to the four-year sentence imposed on count 1, the trial court imposed a 10-year consecutive term for the personal use of a firearm enhancement.

After defendant was convicted but before his case became final, the Governor signed Senate Bill No. 620 (2017-2018 Reg. Sess.) (S.B. 620).  Following the enactment of S.B. 620, section 12022.53, at issue in this case, now includes language stating:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (§ 12022.53, subd. (h).)  Prior to the enactment of S.B. 620, and when defendant was sentenced, courts did not have discretion to strike or dismiss these enhancements.

We granted defendant's request for supplemental briefing on the impact of S.B. 620.  In his supplemental opening brief, defendant asserts that S.B. 620 must be applied retroactively to him and his case must be remanded to the trial court to permit the court to exercise its now authorized discretion to strike his section 12022.53, subdivision (b), firearm enhancement.

41

The People concede that S.B. 620 must be applied retroactively and we agree. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) The People also concede remand is appropriate and we shall do so.

## DISPOSITION

The matter is remanded for the trial court to consider whether to exercise its discretion to strike or dismiss the section 12022.53, subdivision (b), enhancement in the interest of justice under section 1385, subdivision (a). In all other respects, the judgment is affirmed.

/s/
MURRAY, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
RENNER, J.

42